Case number 19-5322, in brief, in the matter of the Federal Bureau of Prisons Execution Protocol Cases, James H. Rohn, Jr. et al. v. William P. Barr, Attorney General et al. Appellant. Ms. Patterson for the Appellant, Ms. Sessions for the Appellant. Thank you. May it please the Court, Melissa... Good morning. Good morning. Melissa Patterson for the Federal Government. I'd like to reserve three minutes for rebuttal. The district court here has categorically enjoined the Federal Government from carrying out four executions on just one of the multiple grounds on which plaintiffs sought a preliminary injunction. Three Supreme Court justices have already indicated that the government is likely to prevail on that one ground. Let me just interrupt you with a preliminary question prompted by what you said. Do we have to... Can't we just go to the merits? Don't we have cases that say the appeal of a preliminary injunction? We just go ahead and decide the merits of the issue. Certainly, Your Honor. So we don't have to deal with likelihood of success or reputable injury. We can just focus on the merits of the case. I think that's right. Why don't we just do that today? Why don't you focus on that? Certainly, Your Honor. Turning to the merits of the one ground that the district court addressed, the Federal Death Penalty Act, the FDPA's manner requirement. We think that the term manner, while susceptible potentially to multiple meanings, needs to be interpreted in light of the long history of that term as used in federal death penalty statutes stretching back to 1790. And in those statutes, it has always meant the general means or method of execution at the level of generality of hanging, electrocution, gas. That was true in 1790. That was true in the 1937 Act. We think that was true in 1994 when Congress again used the same term at Hatch. So this is a term that comes with a long statutory history. And we know that when Congress transplants a term, it brings the soil that came with the old soil. It brings it with it. I understand your argument that manner can mean method, but what's your authority for the proposition that manner can only mean method? I don't think we need to show that manner can only mean. You don't? Isn't that the key question in the case? No, Your Honor. I think the key question in the case is what this term means using all the relevant tools of statutory construction. And, of course, we need to look at how Congress has used this term. Congress essentially in 1994 reenacted a version of the 1937 Act. And I urge the Court to look at the 1937 legislative history that makes elusive that what Congress was trying to do in moving from a statute that said the method of execution is hanging to move to a statute that says the manner of execution is that prescribed by the state of conviction. It is clear that what they were trying to do is to entrench a very limited section of state law at the level of generality of electrocution or gas. Except that under the, as best I can tell from the material cited in the briefs, every federal execution under the 1937 Act, except for three, were carried out by state execution officials. In all those executions, Marshall took the condemned person to the state for execution by the state. Isn't that true? I believe that there were approximately 20 executions under the 1937 Act. We have pointed to three that were conducted in federal facilities. But those three were conducted in states where the sentence of death had been imposed. Correct, Your Honor. But they were conducted in federal facilities. Correct. But every, since you want us to rely on the 1937 Act, every execution under the 1937 Act was carried out in the state where the condemned person was sentenced. I don't think that's relevant, Your Honor. I think what's relevant... Well, you just told me we're supposed to rely on the 1937 Act. Oh, Your Honor, I apologize. The fact that it was carried out in the state doesn't tell us much. What we need to look at is whether it was carried out according to all the state procedures. Now, it is true that the federal government has often opted, as it is permitted but not required to under both the 1937 Act and as today under the 1994 FDPA, to ask states to use their facilities and personnel. And so that often was the case, I think, in the majority of executions under the 1937 Act. Yeah. Ms. Parson, let me ask you, maybe there isn't a different way to look at this. So we're interpreting the Federal Death Penalty Act, right? Right. 3596. And, yes, the word manner is in there. But that statute gives the... Your theory is that manner... Make sure I understand this. Manner means only method and that the Attorney General has the authority to fill in all the details beyond method. That is, manner means method, in this case lethal injection. Everything else, number of injections, chemical used, can be filled in by the AG, right? That's correct. Okay. And does that come... You're not asking for any deference. We are not. Okay. So... And you're not invoking, as best I could tell, any inherent authority of the Attorney General, right? Just the statute. Correct. Okay. So 3596 gives the AG three responsibilities, and only three. He retains custody during the appeals. When it's time for the execution, he, quote, releases the condemned person to the marshal, right? And third, he authorizes payment to the states. Those are the only three responsibilities the Attorney General has under 3596. I think this may be going to include his argument that somehow Congress intended to... No, no, no. Don't go into Plano's argument. How would the statute like that, since you're not invoking any other authority,  How can a statute that gives a federal official three express responsibilities be interpreted to give that official a fourth? Namely, filling in all the details of the process of execution. Your Honor, I may have misunderstood your earlier question. If the question is, why does the Attorney General have the authority to issue rules generally, of course, the Attorney General does have general rulemaking authority over all DOJ functions. But there's nothing in 3596 that gives him authority to issue regulations, to issue these standards, right? I think the Attorney General broadly is charged with executing court orders. I'm not questioning the Attorney General's power to issue regulations. I'm questioning where under this statute, where there are three express delegations, he has the authority to issue regulations regarding a different aspect of executions. Where did that come from? And I think I'm referring to the marriage of the Attorney General's general rulemaking authority with his authority over carrying out sentences of death as well as other sentences. And I don't think it's sort of questioned at that level here that the Attorney General can control some aspects of this process. The real question here is how much? How much do we have to look to stay there? But didn't we conclude, you still haven't answered my question. We have a statute that gives him three express responsibilities. He could issue regulations regarding each of those. He could, for example, issue regulations about how he's going to maintain custody or the details of the release, or he could issue regulations about the payment and the amounts. But how can you interpret a statute like this with three express delegations to imply a fourth delegation before not covering those three? That's what I'm trying to understand. Maybe there's an answer. The statute does rest responsibility for, in the first instance, for implementing sentences to the U.S. Marshal. The U.S. Marshal is part of the Department of Justice. All of the responsibilities of the Marshal are vested in the Attorney General. And so, again, I don't think the idea that someone in the federal government has the authority to issue regulations about something is in question here. The question is how much. Is this protocol a regulation, or is it a general statement of policy? Is it a procedural rule? I mean, what is the protocol? It is not a regulation, Your Honor, certainly. And the lines among the various exceptions in 553B to the notice of rulemaking requirements are, as this Court has said, fuzzy. But we think it would qualify either as a policy statement or a procedural rule. And if that's the case, then why has the Department not argued that this is not reviewable here? Because ordinarily general statements of policy and procedural rules are not judicially reviewable because they're not final agency action. We haven't made a final agency action here, Your Honor. We haven't attempted to say that the APA is unavailable to review these. What we have said is that we think that this Court should resolve these challenges as expeditiously as possible, consistent with the Supreme Court's recent instructions in Bucklew to not allow these method of execution challenges to essentially provide a new means of post-habeas delay. The Supreme Court, in cases like how many have been done in the state context, have indicated that 1983 is available as a way to challenge a method of execution. And we haven't, I don't think we have an interest in saying there's no federal equivalent here. So, I mean, in footnote 11 of your brief, you suggest that you don't really need to have a protocol or regulation in this context, that you could just implement the death penalty without such a regulation or protocol. So I guess what was the reason for issuing the protocol? Your Honor, we do think that, as occurred under the 1937 Act, where I don't think there were any regulations spelling everything out, you know, the power to execute the death sentence comes from a court order. We are charged with implementing court orders. So, as you say, we think there is, at minimum, a real question whether or not we needed to spell out the particular procedures. But, of course, the federal government is free to be more transparent about its procedures than it might be strictly required to by law. Returning to the earlier policy statement or procedural rule question, this Court has made clear that just because the government has chosen to go beyond and to issue written guidance to guide its discretion, that doesn't sort of, I think, transmogrify was the word that this Court used, that into the sort of thing that needs to go through notice and comment rulemaking. And I notice that we've touched on that merits issue a few times. That, along with several other purely legal merits questions, was something that the District Court did not reach. Before you get to the other questions, can I just ask you about the Federal Death Penalty Act? So, you make a, to me, this all turns on the meaning of the word manner. And one consideration that cuts against you, at least a little bit, is that that very statute uses the word manner in a different provision, the aggravator provision, in a seemingly broader way. It defines an aggravator as a crime committed in a heinous, atrocious, and cruel manner. So, doesn't that cut against you a little bit? We would have to conclude that the same word in the same statute has different meanings in different sections. But, of course, the presumption that the same word in the statute... It's not conclusive, but... Correct, but as the Supreme Court has said, that readily gives way where there are reasons to believe that Congress meant the word to mean different things. And then the aggravating factor scenario, I think it's true from the, you know, context and history of aggravating factor statutes, that you are not just looking. The aggravating factor when someone has committed a particularly heinous crime is not at the level of strangulation or stabbing or gunshot. The court is supposed to... It's more granular. Exactly, and that's in part to consider, to eliminate some of the arbitrariness that the Supreme Court was concerned about with the death penalty, that you're supposed to look at the degree of granularity to make sure that the particular circumstances of a case warrant this type of penalty. Now, there is simply nothing about the context or the history or the very implausible consequences that would flow from reading manner in a way to impose the same degree of granularity in 3596. And in fact, all of those considerations make it clear that manner in 3592 and manner in 3596 mean very different things. So let's talk about the history for a second. I have jotted in my notes that between 1937 and enactment of the FDPA, there were 23 federal executions and 17 occurred in state facilities. Does that sound right? I think that's ballpark correct, Your Honor. I think that the 23 number, there are some executions that may have happened during the time of the FDA, but, for example, under military commissions or other territorial law. So I believe there are at least 20 that are clearly FDPA and that there are at least three. You mean pre-FDPA? I'm sorry. My apologies. I do mean pre-FDPA. And the vast bulk of these are, I assume, between 1937 and 1984 under the 37 statute as opposed to this odd interim period of 88 to 93 when you have a new statute and 93 to 94 when you have a reg but not the FDPA. I believe that the historical data were all between 37 and 64. Okay. So if we take that universe of basically 1937 to 1984, a couple of things strike me. One is that we're talking about relatively small numbers. And another is a point Judge Tatel made that most of these executions happened in state facilities where presumably just as a matter of course all of the state protocols and procedures would just be followed. A couple of points there, Your Honor. Because the act was not uniformly carried out in state facilities, we know that no one thought that the word manner in the 37 act included it. With regard to facilities. Because many state statutes include, they specify, you know, it has to happen in San Quentin. It has to happen here. It has to happen under the auspices of a particular state official. So the mere fact that we know that they occurred in federal facilities. Well, we know that three occurred. We know. And I think the circumstances of some of those really suggest the error of the plaintiff's argument about the degree of granularity. What do we know about those three? So we know in Michigan the state had not carried out an execution, I believe, in over 100 years. The death penalty was still technically on the books. But they didn't have procedures. And, in fact, I believe that the Michigan governor was adamantly opposed to any executions happening within the state. We think this goes to sort of the impossible. Do you know what happened as a result of that? Do you know the rest of the story? The rest of the story? I have read something about it. It's not on the record here. The story is that he went to the Attorney General, right, and said, don't execute this person in Michigan. And that Attorney General was the same one who had proposed the 37th statute. And he said, no, this person needs to be executed in Michigan. That's the end of your story. I actually, and, again, I'm a little hesitant to go beyond the record, I think the end of the story is a little different. They've done on my reading there. Absolutely. What do you think it is? My version suggests that, in fact, the Attorney General and the President went to the district court there to sort of get a rule to ask. He followed the order of the district court, which said the execution has to be in Michigan. He thought the execution had to be in Michigan. But there's no hint that he thought that the execution had to occur under what the governor or the laws of Michigan said it had to be. And this brings up the real specter of state obstructionism. Or even, just even short of state obstructionism, even a state that has no interest in thwarting the federal death penalty but simply doesn't update its protocol. Is there any evidence of that so far in this case? Obstructionism? Yeah. No, but I do note that the several states, since 2011, when sodium biopental became unavailable, they have left their protocols in place because they don't have any executions they need to conduct. Under plaintiff's theory, we would be hamstrung, the federal government would be hamstrung by a protocol that is impossible to carry out. Just back to history before we get to consequences. Do we know anything about the other two executions? Similar pattern. Federal facility, so that supports your argument that manner can't mean place. Correct. And do we know anything about the... I think the other two were carried out in Kansas, weren't they? Correct. In Leavenworth probably. By hanging, which was what the law of Kansas required. Correct. And the law of Kansas, I believe, also had a number of fairly finely grained provisions about... That's what I'm getting at, yeah. Yes. Do we know whether they felt compelled or not to follow the granular state Kansas protocol one way or the other? I think we know they didn't because the Kansas law specified that the... Other than place. Other than place. I believe that there is an impressively long list of witnesses in the Kansas statute that the warden of Kansas is obliged to invite to the execution. And I don't think there's anything in the historical record that suggests that the federal government considered itself obligated to invite the local prosecutor to the hanging at Leavenworth. And this, I think, brings up something the plaintiffs say for the first time in their response brief, which is that maybe there is sort of an atextual... Okay. Just one more before we get to that. The practice under the FDPA, briefs talk about McVeigh and Jones. Are those the only executions? There was one under execution post-FDPA, but it was the sentences under the ADAA, which at the time had a number of procedures relevant to the death penalty. So they're just two that are relevant? Yes. I don't know that it... I believe that Jones also would have complied with our understanding of the FDPA as well. But not... Of course, neither of those was litigated, correct? The particular question here was not litigated. But notably, they occurred under conditions that would have violated Oklahoma's, at minimum, its location requirements. Can we also... Go ahead. Can we also take a step back? I think, of course, manner is a very important term in 3596. But say we assume for a moment that manner could mean either the method of execution or the method plus other procedures. I think, then, to figure out what manner means, we actually have to look at many of the other words in 3596, which there are not too many arguments about, right? So it says that, you know, the U.S. marshal who shall supervise implementation of the sentence in the manner prescribed by the law of the state. So I guess thinking about those words, I mean, supervise is usually a term that includes something... That includes more discretion than, for instance, just choosing a method, right? Supervise is often a term that is used more broadly. Implementation of the sentence is often a term, even by DOJ, that's used more broadly to include a number of different protocols. And then I think it's important that it says prescribed by the law of the state. There hasn't been much discussion about the law of the state, what that includes, right? Law of the state, for instance, might properly just mean state statutory law, for instance. Not just, you know, not any other procedures that a state happens to use. So I'm wondering if you can explain why your reading of manner fits within that whole phrase, which also includes supervise, implementation, and prescribed by law. Certainly. On the first two terms, I think your observation that they make note the need to do more, to exercise some discretion, very much supports our reading. Of course, under the district court's reading, we simply need... We have no such discretion. We simply go and we find out exactly whatever Indiana's manual is, and then we try to follow most, apparently, but not all, since apparently we can carve out its location and personnel and potentially do numerous other things that may or may not matter, may or may not be litigated over. So I think those first two terms support the government's reading. Prescribed in the law of the state, of course, the district court did not limit itself to anything that happens to be entrenched in the state statute. The district court was talking about things like particular IV insertion procedures. That's what they... I'm just wondering what you think the statute means when it says prescribed by the law of the state. Well, of course, most states, their state law, when they use the word manner, they mean it the same way the federal government has always used that term to mean lethal injection. There's, I believe, one outlier statute in Mississippi that uses the word, say, it shall be a manner of lethal injection via a certain type of drug protocol. But by and large, the term manner was used by states in the same way that the federal government... Well, it's not just about the term manner. Maybe the marshal is bound only to follow those things that are within a state's statute. Well, that generally would be a more... And then the protocol could cover other procedures and other decisions that are not within a state statute. That certainly would be a more limited opinion or basis than the one the district court actually hears. But I want to push back on the idea that that would have been what Congress intended. Of course, that's what we're guided by here. What did Congress mean to do? And when Congress... What did Congress actually do? When Congress used the word manner, we think it was carrying with it the idea that manner relates to the top line, the general method. And so when it said the manner prescribed by the law of the state, the only thing prescribed by the law of the state we should be looking to is manner. And when you look at the consequences of the reading, like the one you've posited, why would Congress have intended the exact degree of constraint on a federal execution to depend on the sort of fortuities of what Congress or, I'm sorry, what a state legislator chose to put in the statute? How granular are the state statutes? Are they very granular? I mean, would the protocol conflict with the statutes of the states that are at issue here? I don't know that certainly in terms of location. I think location is another question where I think we can look to the statute because 3597, I think Congress quite obviously contemplates the use of federal facilities. I think that's right, Your Honor, but I think just looking at the plain language, that shows when Congress said that the federal government may, not that they had to use state facilities and personnel, I think Congress was consistent with our understanding recognizing that manner would not include all the subsidiary procedures, which often include state locations and facilities. And I think the only response. Maybe the location is specifically carved out by 3597. I think that's kind of a suggestion that this Court should read it as what it calls a limited exception to what it thinks is a clear statutory command in 3596. 3597 is not phrased as an exception to anything. It's phrased as an affirmative authorization to the government to choose to do something. So I think we're just fighting the language and structure of the statute. We sort of bend over backwards to import a meaning of manner that is entirely ahistorical here. Moreover, looking to the consequences, again, why would Congress have intended that the federal government, among the sort of many ways to implement a method, a three-drug protocol versus a one-drug protocol, why would Congress have intended to hamstring the federal government and require it to choose one that is less administrable and potentially less humane? What about the change in language between the 1937 statute and the FDPA? Because there is a change. You know, the current FDPA says implementation of the sentence, and the 1937 statute says the manner of inflicting the punishment of death. But I think the key term that carries over is implementation of the sentence in the manner prescribed. So all of these, you know, we have slightly different verbs used along, but they're all modifying manner. And, again, the 1937 Act's legislative history was very clear what they meant by manner. There's no indication that Congress departed, and I think one of the things the district court relied on, the post-1994 legislative history, actually cuts the other way. If you look at the 1995 hearing, again, I urge the court to go and read it. The lack of uniformity that the DOJ was worried about was the uniformity at the level of the method of injection, or I'm sorry, at the method of execution. So if you look at page 33, page 37 of that hearing, it's articulating the concerns that right now the only executions that we could use our lethal injection method for in Terre Haute, as contemplated at the time by the federal regime, would be those, quote, in which lethal injection was permissible in the state in which the inmate was convicted. That was the disconnect. There were a number of states at the time that did not authorize lethal injection. DOJ was worried that this could, theoretically, stymie a future death sentence. It was not worried, somehow, that 1994, contrary to all historical practice, we were, for the first time, bound by every minute detail, right down to IV insertion, a state procedure. Ms. Paschen, you mentioned the latter state provision, which applies in situations where the sentence is imposed in a state without the death penalty, and the district court picks another state, right? I'm sorry, did I hear you right?  I don't think I understood your question. Oh, sorry. I was picking up on your reference to the latter state provision in 3596. This relates to situations where the federal death penalty is imposed in a state where there is no death penalty, right? Yeah. The district court picks a state which has a death penalty. And then, this is what I want to ask you. The statute says, and the sentence shall be implemented in the latter state, right? Yes. So, why do you think that language is there and not in the previous sentence about death sentences in death penalty states? Well, as an initial point, I think the fact that it is in the second manner provision and not in the first manner provision indicates that Congress did not envision manner encompassing things like the location of execution. Really? Why? Well, I mean, one possible reason is that there was a congressional view that, by and large, it was better to not carry out federal executions in a state where we knew that the state itself had chosen not to have capital punishment. That's one possible reason. But there's nothing in the legislative history to explain why this language, which carried over from the 1937 Act, exists. Well, maybe one explanation for why it's in this clause and not the previous one is that it was obvious in the previous clause it carried out in a manner prescribed by the state and a death penalty statement in the state. So, when it got to the second clause, that is, non-death penalty states, Congress had to be explicit that it wanted those executions to also occur in those states. I think that's hard to square with a statutory text, Your Honor, because the latter state provision uses the same term, the manner prescribed by the state's law. So, under the current view, the system we have now, under your view, the Attorney General could, for all executions in states with a death penalty, the Attorney General could, under your theory, choose any place. Doesn't have to choose Indiana, right? Correct. Couldn't choose any place, right? That's right. Okay, so, under your view, the way this works is that the Attorney General picks the location of executions where the crime occurs in a death penalty state, but when the crime occurs in non-death penalty states, the district judge doesn't, right? I think that's right, Your Honor. Why would Congress have set up that kind of scheme? Well, again, I think the fact that Congress put strictures about location only in the latter state provision indicates that Congress was not. No, you're not answering my question. I'm asking you why Congress would have – why it would have chosen such a system where the place of execution is chosen, in some cases, by the Attorney General and, in other cases, by the district court. I mean, what sense does that make? Again, I think one sort of straightforward reason might have been that where we know a state doesn't want its own executions to take place in a state, it chooses to say, okay, if that's the case, you need to pick somewhere else. And the fact that it vested it in the court versus the Attorney General, I don't think, tells us much about what manner means. But the questions you've been getting from me and from Judge Rao are looking at the whole statute, not just the word manner. Our obligation when we interpret a statute is to give meaning to all of its language. And the word manner is just one of many words in the statute. I speak for myself, but I'm trying to understand here, and I think Judge Rao is too, is what does this statute mean, the whole statute? And manner is interpreted in light of all the provisions of the statute. Right? I agree. We have to look at this. I quite agree, Your Honor. So I think at least what I'm getting at, and I'm not sure that's why I'm asking these questions, is maybe there's something – maybe the debate about manner isn't the right debate. Maybe the fundamental debate here or the fundamental proposition of 3596 is that Congress – and again, this is just an idea. I'm not telling you this is what I think. If you read 3596 with the limited delegation to the Attorney General and all the references to the state and the history, the pre-federal death penalty, what this looks like is that Congress was basically vexing responsibility for carrying out federal death penalties in the states. And if that's the case, the word manner isn't so important anymore because obviously the states will carry out the executions in the manner prescribed by their law. I mean, that's one way to look at this. I think that's the wrong way to look at it. I thought you'd think that's wrong. Just tell me why. And don't go back to telling me what manner means. That's not an answer to my question. As a holistic endeavor, we don't think any of the words in this statute indicate that Congress for the first time ever thought that it was either 1937 or 1994 sort of tying the federal government's hands to make sure that federal executions happened responsibly. And one way we know that Congress did not intend to say the states are in charge here is 3597, which specifically in both 37 and 94 says it said that the federal government may. If Congress wanted to put the states in the driver's seat and say you just need to make sure that you do whatever the state says, it would not have used a permissive term in 3597. I agree with you, but that's not inconsistent with my question. I mean, I wasn't saying to you that all executions must be carried out by the states in the states. I was just saying that if you look at the statute in the history, it looks like Congress expected that to be the normal course. And in fact, when Congress passed 3596, again, tell me if I'm wrong about this. There was one person on that federal death row, right? Just one. And there was no federal execution facility at all. So when Congress passed this statute, 3596, it would have been perfectly logical for it. Given that, given that there was only one person, most executions were being carried out in the states, and the federal government didn't have terrorism at the time. We're going to have the states do it. The quarrel with South Lafayette County, Your Honor, I believe that there was more than one. I believe that there were at least two people who had been convicted in Virginia in 1993. Okay, two. Okay. And there may have been more. It is a small number. But there were dozens as it were now. That is correct. But, again, I think that I'm also going to quarrel with your characterization of what happened under the 1937 Act. I think both from its origins in 1937, when both the attorney general recommended that we switch to a regime that depended on state method, such as at the level of generality of electrocution or gas, and when Congress itself adopted that, it did not intend to sweep in whatever subsidiary procedures a state may or may not have chosen to insert in its law. And we know that there were federal executions carried out when the state was unwilling. I doubt that the governor of Michigan had there been procedures on the book at that time. I do not think that Governor Murphy would have said, yes, please come in and use our facilities. We will tell you exactly how we conduct a hanging. And it is somewhat remarkable that plaintiffs suggest with no evidence that the sort of understanding included such details as the particular drop method used in a hanging. It may have been that states had preferences as to a short drop or a long drop, but there is just no record to back up the idea. Why do you re-prescribe by the law the states so broadly? I mean, do the state laws specify the procedures at that level of detail? I think a number of the states don't even, do they specify lethal injection but not the specific drug that should be used? Is that correct? At the statutory level, that's right, Your Honor. So why do you re-prescribe by law to include any other procedures that a state may use in the process? Well, of course, we don't need them to include any procedures that state use, but the district court read it to include all of the procedures that a particular state used. Recall that the district court's reasoning is that the federal government essentially has no role in deciding how to carry out... Maybe it's not all or nothing. Yes, but we also think that if you said, well, the district court was wrong to go as far as it did, you simply look at the state statutes and look to what the state legislature chose to sort of put in the statute versus a regulation versus a prison manual. I think it's pretty incongruous to think that Congress thought the degree of federal control over how to implement responsibly a federal execution was going to depend on the happenstance of exactly where in its law or regulation or sub-regulatory guidance the state chose to write out very detailed procedures. Again, it is remarkable to think Congress... to defer to a state about issues regarding the death penalty that were important enough for them to enact in positive law. I don't know why that would be so peculiar. I mean, you yourself said that it's understandable that Congress would want federal executions carried out, not carried out in states without the death penalty, so it's being respectful to state law. Judge Rao just said that seems to be what the statute says. Well, I'm going to come back to Manner at potential... to just yield potential dismay, but we do... It's not my dismay. We have to look at what Congress said, and Congress said the only thing that is prescribed in the law of the state that the federal government has to abide by is the manner. It's always a term. Let me ask you, while we're talking about this, just a few other clues that I want to ask you about, about how I should think about. So when Congress passed 3596, there were in existence federal regulations that required... that called for federal implementation of executions in accordance with federal standards, right? Yes, the lethal injection regulations. Yes, they were in existence then, right? Yes. And the Attorney General at the time warned Congress that the bill they were considering, and I'm quoting here, the procedures contemplate a return to an earlier system in which the federal government did not directly carry out executions, but made arrangements for states to do it. So how do we think about that? Since at the time Congress passed 3596, there were regulations in place like the ones you have, but Congress seems to have ignored them, including the Attorney General's warning that this statute would return us to a previous system. How do I think about that? I think you have to think about it in terms of what state law provided at the time, and at the time a significant number of states did not permit lethal injection. And so when DOJ was concerned about a law... Did she say anything about lethal injection? She did not. That's what I thought. But the statement, which is very brief, is consistent with a concern about lack of uniformity at that level, at the level of the fact that, okay, we have a federal regulation that says the federal government is only willing to use lethal injection. We have a law that comes along that says, no, you need to look at the method. You need to look to whether a state uses lethal injection or an execution or firing squad. Now, we're not contesting that the 1994 Act introduced some degree of potential non-uniformity, and that was what DOJ was concerned in the legislative history about the 1994 Act. And I think if you look at the 1995 hearing, that concern about the degree of non-uniformity is very clearly pegged to the method of execution. Now, of course, this concern dissipated over time. States around the same time started adopting all...they all adopted eventually lethal injection as the method. And I don't believe there were any federal executions that needed to go forward. I believe both Jones and McVeigh, their states did provide for an execution by lethal injection. So the concern dissipated over time, but it is that concern, that degree of non-uniformity. We agree that there was some degree of non-uniformity that was introduced, but it is a question of degree. And we think... You think the Attorney General... The Attorney General's only obligation is to use lethal injection, right? He can fill in all the other details. And I know you mean certainly the number of injections. Do you also...does he also have authority to select the substance? Certainly, Your Honor. So in this case, the substance is the substance the states are using, right? No. In this particular plaintiff, two of the inmates would be in states where the protocol would be the same. A single drug and a Barbital. But two of the states, Mr. Lee in Arkansas and Mr. Honkin, convicted in Iowa, but Indiana was designated, would be subject to the three-drug sequence if the federal government was aware. Right, but suppose, for example, could the Attorney General pick a completely different chemical? Like, there's a letter in the record from the BOP saying they found a source of fentanyl. Could the Attorney General use fentanyl, even though no state in the United States uses it? Absolutely, Your Honor, because manner is properly... You are consistent with your principles, I'll tell you that. Yes, I think that the Attorney General... I think this goes to the Attorney General's discretion to... a manner of injection that is both practicable, that hasn't been sort of put out of practice by states that may not have had a reason to update their protocols, and also that the federal government is permitted to choose among the wide range of acceptable means of implementing lethal injection under the Eighth Amendment. That is a range, and we should be allowed to choose, and there's no reason Congress would have wanted to forestall us from choosing the method that... And I think maybe there may be a case like this. Suppose a district judge in a non-death penalty state doesn't pick Indiana. Has that happened somewhere? I believe there may have been one case that had them finish the review. What would you do about that? I think, well, of course we could simply use a federal facility in the designated state. In the designated state? Yes. Is that what you'd do? Correct. We also, just as a practical matter, I imagine we could return to the court and ask it to designate Indiana for administrative practicability reasons, but certainly it would be open to us to carry out the execution in a federal facility in whatever the alternate state was. Can I take you back to the state statutes? Yes. So Judge Rau was asking you how granular they are. I'm curious about how they use the word manner. You cite Missouri and California, which seem to cut in your favor. Your friends on the other side cite Mississippi and Colorado, which seem to cut against you. That looks a little thin and looks like it's a close race. Do we know anything? What do we know beyond those four states? I'm going to disagree that Colorado actually cuts against us. I think if you look at the text of the statute, it uses manner to refer to lethal injections. And then it defines lethal injections as sodium biopentol. Correct, but it only uses the word manner in connection sort of with its tab line about child use lethal injections. So we actually don't think Colorado is a counterexample. Mississippi does use manner in the way that they suggest, but again, I think there are more states, and I apologize, we have not done a survey of the something like 40 states that had the death penalty at the time to figure out exactly the degree of granularity. But I do know that something like, I think the majority of states do specify sort of who is supposed to be there, who is supposed to perform. So if you go from top line to bottom line, right, your position is lethal injection versus electrocution, and everybody gets that. And on the other end of the spectrum is which vein you pick, and that seems awfully granular. But the question of which drug you pick, and that might not be top line, but that's line number two. It's not which vein, how do you insert the catheter, how big does the catheter have to be. I agree with that, but again, we think the history and the impossible consequences that would flow from going that next degree of granularity down, cut against reading this term to have that, even that second line of granularity. Moreover, if we're talking about sort of how far down do you go, you get into very difficult questions about, okay, on their reading of manner, how much is detailed enough versus too detailed. And again, I want to return to their suggestion that there is some form of de minimis exception that the court should engraft onto this. I assume that they proposed this because it could be nigh on unworkable to comply, potentially even at the statutory level, but certainly at the level the district court picked, with every jot of state statute. And there are no guideposts in this suggestion for how the government would know which ones are of the sort of significance that Congress intended to entrench in this law. Of course, Congress itself gives no indication, and we say that's because it never contemplated that the federal government or courts would be in this endeavor of trying to figure out what is the right level of granularity. And I think that this would put courts in a position the Supreme Court has said they should not occupy into inquiring at that level of detail into how a government conducts an execution. Well, maybe those decisions should be made by Congress. Maybe that's the answer. You're clearly right about judges. We shouldn't be deciding that. But maybe Congress should be making these decisions, life and death decisions. I think Congress could make those decisions. I asked you whether or not maybe they should be required. Well, Your Honor, I'm not in a position to issue policy edicts to Congress about the level of detail with which it should speak. I can only talk about what Congress has to do. The only reason it's a relevant question, Ms. Patterson, is that many of your arguments have been that if 3596 does not contemplate a federal system under federal standards, that there are lots of problems, that states could interfere, that the Attorney General would be limited in his ability to take a substance. My only point about that, then, is maybe the Attorney General should go back to Congress and say, well, these are really fundamentally unknown questions that the politically accountable branches of government should make a decision about. Well, the Executive Branch is politically accountable, too, Your Honor, and I think that Congress is free to leave these sorts of details to the Executive Branch. I think that this is, again, an argument very much in our favor of the reading of the statute. I think that the cases like U.S. Telecom, they cite, about the sort of blurring of lines of accountability, very much cut in our favor. If the federal government is obliged to hand over and use only the... Aren't those consequences just a natural result of a federalist system, right, where Congress is chosen to lead certain decisions to the states? I mean, all these decisions about not being able to pick a single, uniform, you know, rational, more humane, you know, whatever adjectives you want to use, protocol, I mean, that's just a consequence of a choice made to lead some of these decisions to the states. And you can say that about any statute that leads certain decisions to the states. I think that presupposes an answer to the central question here, which is how much of the state stuff did Congress intend to put in the statute? And on our reading, the one historically based, it leaves the federal government accountable for carrying out federal executions in a responsible way. Their reading means that the federal government, if it had to either sort of hand over responsibility for the execution to the state personnel because there was no practicable way for the federal government itself to do it, or if it had to sort of try its best to read every detail of state procedure and follow it, if something goes wrong, it's hard to know whom to hold accountable. Do you hold accountable the federal one, the federal official who carried out this execution or who authorized this execution by state personnel? Or does the federal government say, don't blame us, we were required to do that by the states? The much more natural reading of the statute is that Congress intended to leave federal executions in the responsibility, in the keeping of the federal government. Now, the government may choose to use state facilities, and of course it would bear any political consequences if something went wrong after it had chosen to contract with the state to carry it out. Let me ask you, this is my last textual question, I promise. And it follows from what you just said to Judge Rao, that what Congress clearly intended here was to have the federal government execute its prisoners in accordance with its standards. So my question then is, what do you make of this language in 3596? It says, the Attorney General shall release the person to the custody of a United States Marshal. So the three plaintiffs in this case are in Terre Haute now, right? A BOP facility, correct? Correct. So two questions. One, if Congress had expected these executions to be carried out by the federal government, pursuant to federal standards, in Terre Haute, why did it need to say anything at all about the Marshals? I mean, under federal law, the Marshals are responsible for implementing court orders and for transferring prisoners. That's what Marshals do. So in the Terre Haute situation, what does this mean? The prisoner's already in BOP facility, which is where the death chamber is. So how does this language work? What does it do? I think it maintains U.S. Marshals' historic default role, that as you say, transferring prisoners. What does it mean to transfer a prisoner who's in BOP custody to U.S. Marshal custody, where he then supervise implementation of the sentence in the manner prescribed? I don't understand how that works in the Terre Haute situation. Well, of course, the Terre Haute situation. He's in BOP. These three people are in BOP custody now. The Terre Haute situation is not in terms of the statute. Is not what? As you said, the Terre Haute situation is not a necessary part of the statute. That's a choice made by the federal government. Forget Terre Haute. The BOP, any prisoner awaiting execution is in the custody of the Attorney General. When the appeals are completed, the Attorney General releases him to the custody of a Marshal. Doesn't that suggest that the execution is going to be somewhere other than the federal government? Okay. Even if that were true, you could have a situation like the one we posited, where a court has designated an alternate state, and you need to move the federal prisoner to the U.S. Marshal. I'm reading from the provision that applies where there's a death penalty state. I think that that same provision regarding the U.S. Marshal carries over to the latter state provision. So you may well have to transport a prisoner. It may have been that there was a federal death chamber somewhere other than a BOP facility. But more fundamentally, I want to push back on the tacit notion that the U.S. Marshal would have been understood to be sort of entirely separate and distinct from the Attorney General. I didn't say that. I was just reading to you from the statute. And so Congress wanted to, at least in the first instance and by default, have the U.S. Marshal, who I believe since 1790 has played a role in federal execution and certainly has experience in this area, to be involved in the process. But that does not suggest some sort of fundamental distinction between the Attorney General, DOJ on this hand and DOJ on that hand. It's all DOJ. And so I think the Attorney General would have been free to reassign someone to the U.S. Marshal's role. Of course, that's not what's happened. The Marshal continues to play a supervisory role in executions under the protocol announced here. But I don't think we can draw any inference about sort of the level of detail of state procedure from the reference to U.S. Marshal. Okay. Ms. Patterson, thank you. We do have another slide. Let's hear from that. If I could have a few minutes of rebuttal. You definitely can have some time. Thank you, Mr. Chairman. We definitely took up your rebuttal. Good morning, Your Honors. May it please the Court. My name is Kate Stetson. I'm arguing on behalf of the plaintiffs this morning. Listening to counsel's argument and the panel's questions, it strikes me that this argument breaks down into three basic parts, text and history and consequences. I'd like to start with the text, and I'd actually like to start, Judge Rau, with your question about that entire line of text because I think it is important to look at that entire line. By the way, I'm sorry to interrupt you, but do you agree with the government that we can just deal with the merits here, right? Yes. We don't have to worry about the preliminary injunction? With the merits of this issue. Of this issue. Yes. Okay, great. Sorry. Go ahead. Sure. So, with respect, Judge Rau, to this phrase, supervise implementation of the sentence in the manner prescribed by the law of the state. So, first, with respect to the law of the state, this, of course, isn't an argument that the government made, probably for good reason, that the law of the state is consigned to statute. But the other good reason is that the Supreme Court, for many decades, even as early as 1957, it was saying we have repeatedly ruled that the law of the state includes administrative orders and binding administrative issuances. And that was in U.S. v. Howard, 352 U.S. 212. You can also look at Chrysler v. Brown from 1979. So, the law of the state is definitely more capacious than just statutes. Getting back to the front of the text, supervise implementation. Supervise, of course, has to be read in terms of what is being supervised. And what is being supervised is implementation of the sentence. And I want to get to of the sentence as well. But just to pause on implementation, because the one thing I don't think we heard, other than your question, Judge Rao, was an explanation about how implementation fits into this particular analysis. I suspect that is because, and you didn't see it in the government's reply brief either, the government understands what implementation means. If you look at the top of the addendum that we're challenging, it says federal death sentence implementation procedures. That doesn't help you. Implementation could, implementation seems broader than simply method of execution. But it could mean, it could be coextensive with manner, and manner means procedures, which is your theory. Or it could mean you implement the sentence, and one thing you have to do is follow the method of execution. So I don't see how the breadth of implementation tends to answer the interpretive ambiguity of the word manner. I think it answers it, and it's more, of course, than that particular document. Back in the, when the proposed and final rules were issued in 1993 and 94, those rules were called implementation of the death sentence. So I think it is a far more strained reading to say that one is implementing a lethal injection. The question is, under implementation, what is the process that is being gone through in order to effectuate the lethal injection? Judge Katsas, you also asked a question about manner that I think bears on this as well, and the question had to do with the aggravator. So before we get to that, that argument, we take that to its logical conclusion, then manner means any process specified in the positive law of the state. Statutes, regs, a protocol which has binding effect, right, anything. I would say no to that for this reason. And I think this actually goes to one of the consequences that the government and Ms. Patterson today have flagged. So you carve out, you have an argument for carving out place, and you have an argument for carving out de minimis. And we can talk about those, but at a minimum, you're saying everything else. Well, but I want to touch on what that means when I say de minimis. Okay. What we are talking about here is the manner of implementing the sentence. In other words, the manner of effectuating the death. So there are, I think Judge Rao, you might have asked a question about how detailed these particular protocols are. They vary, of course. There are some that are very targeted to the particulars of the lethal injection. What is the IV process? Who monitors the prisoner? Who is, is there a physician in the room? Those types of things. But there are other protocols, of course, that talk about much more. They talk about how many phone calls a prisoner gets in the days before the execution. They talk about who is in the chamber. Those sorts of things. That is not part of the manner of implementing the sentence. That is why when we talk, we can talk about it in terms of de minimis exception. You can talk about it in terms of harmless error. You can talk about it in terms of standing, what a prisoner had standing. So if we go to the protocol, the 2019 protocol, it says three sets of syringes. Each syringe, each set itself has three syringes and there is a sequence of 2.5 ml or whatever, followed by another 2.5, followed by saline. All of that is regulated by state law. It is indeed. And I can point you to the ways in which the courts have understood this as well. If you look in the administrative record of page 364, there is a copy of the Judge Ketledge opinion in the Ohio execution protocol cases. And I want to focus in on something he says on that page, which is he discusses the procedures that ensure that executions are carried out humanely. That is his quote. And there he gives examples. And the examples he says are including instructions for how to place the IV, a consciousness check, training requirements for execution personnel. Sorry, which case is this? This is the in the Ohio execution protocol case. It is reprinted at AR 354. You can also look, for example, at the cluster of Supreme Court cases that have come out in the last several years, Glossip, Bays, Bucklew. And each of them, by the way, of course, is called a method of execution case. But they're not challenging lethal injection. They are challenging aspects of the lethal injection process. And if you look at those cases and what they are challenging and what the courts have said is important for the question that Judge Ketledge posed, how is this execution to be carried out humanely, what you'll see is the particulars of the drug protocol, of course, in all of them. The dosages were an issue in Bays. The qualifications of the executioners were an issue in Bays. The IV safeguards, including things like how to flush and monitor the IV lines, were an issue in Bays and Glossip and Bucklew. And the means of access to somebody's veins were an issue in Bucklew. So when we talk about manner, no, it doesn't include every jot of a state's broad protocol. Yes, it does include. What about strapping federal protocols as you have to strap the inmate to the execution table 30 minutes prior? Is that covered? I think no. I think that the 30 minutes prior, of course, there are many different state protocols. You can look at Missouri's, for example, that has a very detailed, timed protocol starting 24 hours, I think, before the execution. There is not a sense in which that pertains to the manner of execution in anything other than a completely tangential way. So the 30 minutes before I don't think would be covered. I do think when you come to the question about what the prisoner is experiencing, those types of things, IV placement, monitoring, consciousness check, qualifications, dosage, those are the core of any execution protocol. And that is what we are talking about when we talk about manner, not what time the prisoner gets to make a call or what the prisoner gets to eat. And you think a federal facility, well, let me ask you this, do you think the execution can occur in a federal facility? Or does manner include state? I do. Does it require state? I do. And this is one respect in which I think Ms. Patterson and I are not far apart, although obviously for different reasons. 3597 carves out an exception for federal personnel to carry that out at federal facilities. It talks about the, as Ms. Patterson said, the marshal may use state facilities or state personnel. The attorney general, as Judge Tatel pointed out, has to reimburse. But may means, of course, that you can use federal facilities, federal personnel. So that would not be part of the manner. Except it's not written as an exception. No, but it's written. If it were an exception, if manner means what you say, and 3597 is an exception for location, it would have read may carry out executions in federal facilities. I don't think, I mean, it could equally perhaps have been written that way. But I think the fact that it was written to provide not just the U.S. marshal with the ability to carry out in state facilities, but of course with the assurance that the states would be paid for that, the fact that it was drafted in some different way, I think doesn't undermine the meaning of manner. It's a very odd way to create an exception if manner means all state process. No, not at all. It's a very odd way to say except with regard to whether the facility is state or federal. I think it also goes back, though, Judge Katz, to what I was describing as the scope of manner, right? Because the place of an execution, whether it is in Terre Haute or somewhere down the road in a state facility, that does not pertain to the kind of the cluster of issues that makes an execution more humane. The particular person carrying it out, as long as that person is qualified, which is a question of humaneness, of prisoner dignity under those cases, who exactly carries it out is not part of the manner. So whether we talk about it as a carve-out so that the federal government can have its own execution facility, or we just say that actually doesn't bear on manner at all, I think 3597, however you read it, gets you to that place. How is a federal court supposed to determine where this line is? I mean, because you're suggesting it's not everything that's in the positive law, whether that's statutory or regulatory law of the state, but it's something else. I mean, how is a federal court supposed to sort out what is part of manner and what's not? Because your line is saying not everything, not necessarily even everything in law, and you've named a number of different things that could be included, but a number of things you say are definitely not included. I mean, is that really something that we can sort out? I think it is. I mean, if it hasn't been something that you've been called upon to sort out yet, because the government's position, as Ms. Patterson mentioned and Judge Teutel, is method means lethal injection, full stop. So they don't get into a question about what manner could mean if it means, as it must, something more than just lethal injection. It has to mean, in addition to that, for example, the drugs and the dosages and so forth. But I think the ways that courts would deal with it are among the ways that I mentioned earlier, I think, to Judge Katsas, which are questions about standing. If someone comes in and files a lawsuit saying, I want my dinner six hours before the execution and not eight, that strikes me as not something, perhaps, that is likely to bear on the manner of execution. Questions about harmless error under the APA, which, of course, has the provision that due notice must be taken of the rule of harmless error. That's another way that a court could manage it. But I think even the government, as I said, understands what it means to pass procedures that implement an execution. And if you look even at the detailed state procedures, they break down into different sections. There's a section on media protocol. There's a section on visitors and witnesses. And there's a section on execution. So I think it's quite easy, in fact, for a court, and for the federal government, which has been doing this for many decades, to look at the execution procedures, the procedures that are meant to effectuate a humane execution, and be able to map their practice onto that practice. I want to say one thing about this. I mean, both the addendum and the original protocol mix together provisions that you say are covered and provisions that you say are not covered. It doesn't cleave as neatly as you're suggesting. I think the addendum itself is relatively thoroughgoingly addressed in manner, with the exception, perhaps, of the provision about the- Restraining 30 minutes, strapping them to the table 30 minutes in advance. You told me that wasn't covered. That's in the middle of the addendum. Yes, but with respect to – I think that the fact that you can isolate a couple things, like the identity shall be shielded, the person will be strapped 30 minutes in advance, the nature of that document is, as Ms. Patterson also said, to try to ensure a humane execution. So I think to Judge Rouse's question, the way to sort out those issues, it's just as I've described them. Does this bear on whether an execution is humane? And the way that Judge Keffrey put it- And you don't think a very creative lawyer faced with an imminent execution could come up with some argument that being strapped to the table for half an hour itself induces an extra level of terror? I think there are many lawyers who have challenged many aspects of many state protocols, and many of those aspects have been found either appropriate or not warranting or not rising to the level, of course, of an Eighth Amendment violation. But the question here, I think, is, are we talking about- How much does manner sweep up? And it seems like your no answer to questions like that is less than definitive. I don't think that- Take witnesses. Suppose an inmate says, it's really important to me to have my minor child present. Federal protocol says no. Is that covered? In my estimation, I will say this, that certainly has not been in any of the cases I have read involving method of execution. No, but we're getting more and more granular.  And now you're telling us it's challenges to whether you use three syringes or six. Perhaps we can look at it this way. The state procedures that we're talking about, of course, have been repeatedly brought under challenge. So this is not- What we are arguing for, which is the reading of manner that goes- to the way the government has thought of that word, which we can get to in a moment. But this is not- Talking about manner in terms of talking about the aspects of an execution that make it as humane as possible for the prisoner, that's not a new concept, and it doesn't carve out new opportunities or material for lawyers. Those opportunities and that material have been there all along in the state protocols. Where does that standard come from in the statute? The standard that you keep repeating about ensuring that we have a humane execution. Of course, we'd like to have executions that are as humane as possible. But I'm not sure where that line comes, where the statute brought that line. I think I was using it as an example of how the courts have identified the aspects of the execution that pertain to the manner of execution.  What the statutory hook is, and the government mentions in its reply brief, and I think Ms. Patterson did today, that this idea that the minimum exception does not graft it onto anything. We don't need to graft, it's in the statute. The statutory hook says, supervise implementation of the sentence. So what I was attempting to do with the reference to the Ketledge phrase is, what does that mean, implementation in the manner prescribed of the sentence itself? Not of the witnesses, not of when the curtain opens or closes, but when the execution itself happens. What is that implementation? Can we also talk a little bit about what this protocol is? Because I think your position is that it's a kind of legislative rule, that it required some kind of delegated authority from Congress in order to enact it, and that it should have been subject to notice and comment. That is one of our arguments. That is one of the arguments. I mean, when I look at this protocol and the addendum, it reads to me much more like a general policy statement or a procedural rule. I mean, the addendum has quite a few carve-outs that have to be followed unless there are other circumstances, as may be required by other circumstances. There are an enormous number of carve-outs. Even in the protocol itself, right, there's, you know, this idea that, you know, it's very open-ended, right? It reads much more like a statement of policy or procedural rule that's not binding. I think a couple of responses to that, in addition to the threshold one, which is, of course, this wasn't ruled on by the district court below, but to your point, I think the first observation is that this addendum has an 1,100-page administrative record attached to it. That says something. The second observation is, in 1993 and 1994, when the government, in the absence of any statute, which came the following year, decided to attempt to implement procedures for executing on sentences, it issued a proposed rule. It received comments, including, by the way, that the government didn't have the authority to do that, and then it issued a final rule. To your point about the open-endedness, I would resist that a little bit, because I think most of the aspects of this protocol are, in fact, quite closed-ended. The director shall do X, the director shall do Y, the director shall do Z.  depending on the circumstances presented by the execution, to alter a particular approach. But that itself doesn't take this out of any kind of a binding directive that has an effect on these prisoners. The example, I think, that the government gives is with respect to winter, that this is just sort of a procedural challenge, and therefore this is just a policy issue. This has real effect on... Would something like the U.S. Attorney's Manual have to go through notice-and-comment rulemaking? I would say no as to the U.S. Attorney's Manual. Why is that different from this protocol? Because this, I would argue, and again, the reason that we're a little bit hamstrung talking about this, of course, is that the district court hasn't fully analyzed this. But what I would say is when you have a series of commands that purports to affect an execution of another person, that that person has some rights that are bound up in that process. Not so much, perhaps, with the more generalized and more generally applicable U.S. Attorney's Manual. But with respect to the history of this statute, I want to make one point, if I could, which is with respect to the 1937 Act, what you heard from Ms. Patterson today was that since 1790, the statute has said the same thing. One word on 1790. The 1790 statute, as I think Judge Rao observed, says, the manner of inflicting death shall be hanging. So it says inflicting, and it also says the manner shall be X. So set aside 1790.  Sorry, why do we set aside that? Because that statute... It seems like it's a crystal clear example that Congress, in the particular context of method, mode, process of execution, used manner in the way the government is suggesting. Yes, but the statute also used inflicting, as Judge Rao pointed out. But the 1937 Act is where Ms. Patterson, I think, was concentrating. Just on 1790, that statute didn't regulate the length of the rope, the width of the rope, where the rope is placed on the neck, right, which are the analogs of which drug and how many syringes and the like. It didn't, but I think this is an important point, and I think it came up during Ms. Patterson's argument as well. If there is no protocol in place to carry out an execution, then, of course, the statute, the second part of 3596, provides for what happens, which is that the government goes to the sentencing court and asks the sentencing court to send that particular prisoner to a state that does have the death penalty. And, Judge Tatum, in response to your question, the case, perhaps, that he will hear is U.S. v. Samson, which was a case involving a Massachusetts prisoner sent to New Hampshire, not Terre Haute. With respect to 1937... I think, as Ms. Patterson said, that case is still being litigated. I think it is not yet final. But that person could be executed in New Hampshire, right, in a federal facility? Yes. Yes, indeed. That was the ruling of the court. And I don't think, maybe Ms. Patterson can correct me, that the government is challenging that particular ruling. I think there's other litigation around the sentence and so forth. But with respect to 1937, if I can say this, Ms. Patterson is putting a lot of emphasis on this statute reading the same as it did in 1937. But what the government said about the 1937 statute, it said it in its final rule, the one I mentioned, 58th Federal Register, 4899. The 1937 act made federal executions, quote, dependent on procedures in the states, close quote. So the idea that somehow we have transmogrified from 1937 to 1994 is a fiction. The 1937 act the government was realizing in the early 1990s made that process dependent on procedures in the states. I would mention too, briefly, because I think we outlined it... Let's go back to 1937. How would a competent speaker of English have understood the word manner in the context of an execution statute? And you have 150 years under 1790 statute, which seems to be top line method. And you have the legal background at the time, which is method of execution. You have Wilkerson and Kemler, which, firing squad and electrocution, same focus, top line, lethal agent cases. So why would you construe silence on is manner the same or does manner expand to change pretty dramatically that seemingly common and settled understanding? I think the government has already done that for us. But the government's understanding in 1993 of what manner means was that it incorporated in the 1937 act the procedures set forth by the states. But the other way to look at this, Judge Katz, is referencing back to your question about that aggravator statute. That one cuts in your favor. I'll give you that one. So we can either look to a 1937 act that contains a different word, by the way, and that the government conceded a couple decades ago incorporates the procedures set forth by the states. Or we can look at the neighboring statute that you mentioned. Now, the government's response to this in the reply brief is to cite a case from the Supreme Court that says, yes, we usually construe words the same way. But when it's very clear that they're not construed the same way, then you don't construe them the same way. That case, of course, if you look at it, and I urge you to, involves the phrase term of imprisonment. And it was very clear from that statute, as Justice Breyer said, that term of imprisonment plainly meant one thing in one part of the statute and another in another. We have an interpretive choice. And you tell us, look at the same statute, which presumptively we would. But on the other hand, that other provision is addressed to a very different set of issues with its own legal soil, right? The whole jurisprudence of aggravating circumstances under Woodson and the like, as opposed to the government's theory, which is you're looking across statutes back in time, but with respect to the precise issue in the case, which is method of execution. But I think the government's argument on this score is a little bit of it's a dixit and a little bit of focusing overly much on manner. You know, we've talked about the role that implementing plays in this. And we've talked about the fact a couple times that the government itself, and not just in that final rule, has noted that the 1937 Act requires federal executions to be dependent on procedures in the state. Ms. Patterson mentioned the legislative history and the various attempts to change this law. And she talked about the fact that while a lot of those attempts were happening, there were execution methods available in other states that weren't lethal injection. But by 2002, all states but one had gone to lethal injection. And in 2006, the head of the DOJ Capital Case Unit, Margaret Grissy, came to Congress and said this law returns us to the prior law, which makes us dependent on procedures of the states. So it was very clear, even in 2006, when there was I think one state, if even that at that point, left, that what the government, what the DOJ, the BOP, and the Marshal Service, all of whom had issues with the 1994 Act, what they were complaining about were the procedures issued by the states that they had to follow. When did the last state not to have done so authorize lethal injection? I thought it was around the time DOJ stopped seeking this amendment. No, Nebraska by I think the early 2000s was the only state that had not adopted lethal injection. I don't know when it did, but I do know, to Ms. Patterson's point, that the challenge to the 1994 Act that the DOJ and the BOP kept bringing did not pertain to method. It pertained, and I can quote this, this is the hearing on H.R. 5040 in March of 2006, the Margaret Riffey Statement. Existing statutes reflect the practice and expectation that federal death sentence inmates, existing statutes of course being the 1994 Act, that federal death sentence inmates would be executed under state procedures. That is the understanding that the capital case unit had came into Congress with in 2006, executed under state procedures. That's much less helpful to you if the background law is that states permit different execution methods. That would be a true statement. There are different procedures. One state is electrocution and five states are lethal injection. But now I think we're getting into an argument that even the government is making, which is procedures just means method. No, no, no. It's an argument that procedures is a broader term, but they're using it in context. A method is a subset of a procedure. I think that may be an overly strained reading of that word, which is perhaps why the government hasn't adopted it. Procedures used by the states. The government understood a decade and a half before Margaret Griffey came to Congress that procedures used by the states to effectuate the execution, to carry out the sentence. All I'm saying is the question of methods versus other procedures. It's just harder to isolate until the states uniformly adopt the same method. No, I don't think it is. I believe Judge Tatel may have mentioned this as well. Nebraska was not some kind of a thorn in the government's side at that point. I don't think there even was a federal death sentence. What was a thorn in the government's side is that they wanted to perform federal executions their way, not the way that the states set forth. Judge Rau, you made the point earlier. We're here in a very volatile case, of course. But this is a statute that delegates to states the responsibility to do something, and the responsibility is to prescribe methods of execution, manner of execution, implement in the manner prescribed by the states. So in that respect, it's like any other statute, as I think you said, that confers certain responsibilities on the states. Now, the federal government has the opportunity and has taken it to try to encourage Congress to change that law. But what it can't do is override the prerogative of the states to set the manner of execution. Go ahead. Do you think that the Department of Justice can issue a protocol that fills in any gaps in state procedure? So, you know, a state that has, you know, very bare-bones procedures, would this protocol apply there? I think if a state has bare-bones procedures, you know, that there are states, for example, that have no protocol in place. So, for example, California, the government talks about the California moratorium. It's not just a moratorium. There is no protocol in place. So in those circumstances where something is either not in place or very bare-bones, there's a provision for how the government deals with that as well in the statute, right, which is they go to the second part of 3596, and they go to the sentencing court, and they say this law does not provide for implementing this sentence. Now, there may be some kind of gray area between a bare-bones protocol and a law that doesn't provide for implementation of the sentence, but I think the question about the government's gap-filling authority is not, of course, something the government has called on yet for that categorical reason. The government says this is our protocol, and we're sticking with it. So that bare-bones protocol question hasn't come up. It's not likely to come up because all of the protocols that I've reviewed, far from being bare-bones, and because of the number of challenges that are raised to these protocols, are very detailed. But the details matter. The details aren't just there for decoration. The details about the fringes matter. The details about how the IV is placed matter. The details about how closely the prisoner is monitored for consciousness, which is something that is present in all four of these case protocols and not in the government, that matters. Those are the sorts of things that courts have found to matter. Let me say one more thing. Before you go on, let me ask you a couple of sort of general questions. We spent a lot of time with Ms. Patterson talking about the pre-'94 history, the experience under the 37th statute and a number of executions. Do you draw any conclusions from that? Is that relevant to what we're facing here? I think the general conclusion that I would draw is that the federal government and the U.S. Marshals, who have been responsible for this task since the late 1700s, they understand that they are to go to the states to carry out these executions. Now, the government will point to examples. What about the three that were done in federal facilities? I think what we would say to that, and I think what we'd say in our responsive brief, is the fact that you can point to counter-examples or aberrations doesn't somehow give the government, the federal government, the power to do something it doesn't otherwise have. There's not a kind of adverse possession theory to this. The fact that Timothy McVeigh was executed in a certain way, that Mr. Jones was executed in a certain way, neither of those two, by the way, challenged the protocol of their execution, but the fact that those executions occurred under a federal protocol that was unchallenged doesn't mean the government has the authority to issue a federal protocol. It just means that nobody challenged it in that case, and we're challenging it now. Just another question about our discussion with Ms. Patterson. You, like she, focus on the word manner. Are there other parts of this statute that you find relevant that we should be looking at? Judge Rowan, I asked her about several aspects of it. Are there other provisions in this statute that you think are relevant, one way or the other? Yes, very much. Why don't you explain what those are, which ones, and why? Sure, so to begin with, and I think you can start with the word manner, but as we pointed out... Yes, but you can start with that word, which is where the government started, but I do think it's important, as one of Judge Rowe's questions said, to back out the lens a little bit. If you back out the lens to the entire phrase... If you do what? If you back out the camera lens a little bit and you look at the entire phrase that's at issue here, implemented in the manner, supervised implementation in the manner prescribed by the law of the state, each of those elements, and this is what I broke down a little bit earlier, I think has a role. The most important role, and the thing you have not heard the government answer, is this question about implementation. Implementation is something that the government uses when it describes the very procedures that we are talking about. So that's step one. Step two, if you back up a little bit further and you look at the statute more generally, what you will see, in keeping with your observation, I think, Judge Tatel, your first question, is that this statute assigns certain responsibilities to certain entities, not just the Attorney General, who then hands the prisoner over at the point at which the sentence is to be carried out, to the U.S. Marshal, but to the courts, to the federal court system. In the event that a law does not provide for a death penalty, the sentence of death, the avenue is not for the federal government to impose its own protocol. The avenue prescribed by the statute in 3596 is to go to the sentencing court and say, send us to another state. And just as you said, Judge Tatel, that doesn't need to be Indiana. The government can ask for Indiana, but the reason that Mr. Sampson was sent to New Hampshire was because it was close to Massachusetts. And the court there decided that it was important that the execution be carried out in a place where perhaps the witnesses or the victims could come and attempt. So there's no way to read the government's sort of categorical, you know, one-size-fits-all protocol with respect to that aspect of the statute either. And then I think there's 3597, which is what Judge Katz was asking about earlier. The 3597, I think, plays an important role in establishing that the federal government doesn't have to carry out these procedures by itself. And that's for good reason, of course. The U.S. Marshals, for a very long time, have had responsibility for executions. The federal government has only executed 37 people in the last 100 years. The people who know what they're doing are the states that are carrying out the death penalty. So 3597 is designed to permit the federal government to seek their assistance and to compensate the states' assistance for doing that. So I think if you look at the statute in the ground... The Attorney General doesn't have to do it, right? No, no. Your theory leaves space, am I right, for Attorney General, for death penalty protocols issued by the Attorney General to fill in what you call the non-substantive or non-important parts of an execution, right? Certainly to fill in... I think there's two different questions. The Attorney General certainly doesn't need to call upon state facilities or personnel. The U.S. Marshal, in that instance, would supervise the federal execution in keeping with the manner that the state law prescribes. And that could be done in Terre Haute or in Texas? That could be done in Terre Haute or in Texas as long as the execution itself, the carrying out of the sentence, is done in the way that the law of the sentencing state prescribes. Now, the question about whether... and I'm sorry, I forgot the second part of your question, but there's a question about whether the government... whether the Attorney General could... I mean, let's assume that you prevail here. Could the Attorney General then issue a second set of protocols that address the issues left open by state law or deal with the issues that you explained aren't... what was the phrase you used? ...critical to the implementation of the... like, for example, the amount of time for the final dinner, meal or something. Yes, and in fact, if you... If you could ask him the protocols for that, right? Absolutely, and that's in keeping with our argument about what manner means when you read it in light of the statute. Implement the sentence in the manner. So the BOP protocol, the long-form protocol that was issued in 2019, has many aspects that are not relevant to the manner of execution. So the BOP certainly can issue some kind of a protocol that goes to that. What it can't do under this statute is impinge on the state's prerogatives to set forth the protocols that pertain to the execution itself, and that is what the government purported to do here, and that is what the district court found wanting. You may not want to answer this, but let's assume you prevail here, and could the governor take the three prisoners from the death penalty states, Texas, Missouri, and Arkansas, right? There are four. Texas, Missouri, Arkansas, and Indiana, the Terre Haute. No, I'm talking about just the three from the states that have the death penalty, right? Even without the protocol, could the attorney general, quote, release the three to the marshal who would then take them to those three states to supervise their execution there? As long as the executions were carried out in accordance with the respective state protocols, I think the answer is yes. And let me make one more point with respect to recalcitrant states, because this is a policy point that the government raised, and I want to make both a legal and a factual observation. The factual observation is that the democratic governors of states that still have the death penalty are five, and all of them have committed to upholding the death penalty. So that's the factual response. The legal response is, even if you can hypothesize a rogue governor of a state that has an active death penalty, in which there is a federal defendant and an execution is to be carried out, the solution is, in fact, contained in one of the cases that the government cites to you in its reply, which is the Mississippi Band of Choctaw Indians case on page 11 of its reply. That case, in turn, cites a case called Reconstruction Finance Corporation v. Beaver County, Pennsylvania, a Supreme Court case from 1946, and I gave government counsel a copy of that case before we came in today. What that case says is, Congressional purpose is best accomplished by application of federal state rules so long as it is plain, as it is here in that case, that the state rules do not affect a discrimination against the government or run counter to the terms of the federal act. So what the Supreme Court has said in that case and another case called Little Lake, Missouri, that came out in 1973, what the court has said is when, not if, but when you have a circumstance where a state is so far going rogue that it is impeding the government's ability to do its job, the government, of course, has many options. Number one, if a state does withhold its protocol, and by the way, the three that don't make their protocol publicly available are Alabama, Louisiana, and South Carolina. So I don't think the government would have trouble obtaining those protocols, but let's say it does. The government can go to court and ask for the protocols. On what basis? Because the government needs the protocol in order to carry out its obligations under the statute. That gives the government a legal entitlement to a document that state law makes confidential? It gives the government an entitlement to understand, perhaps under some kind of protective order, the manner of the execution that it is federally statutory. What source of federal law would entitle the government to that document? The obligation of the government to carry out a sentence in accordance with 3596. But even if you set that aside, I think that's the most modest way to attack the problem that the government has identified, which is a fictional problem for reasons other than those three states I mentioned. All of these protocols are available in some way or another, including through litigation. Do you think the government's easiest option in those three cases is to transfer the prisoners to those three states for execution? So that's another opportunity. So if it was Alabama, it won't turn over the protocol. That is another opportunity. The government invokes 3597 and says, the marshal will supervise you carrying out the protocol. But the government can't force the state to conduct the execution, right? That would be obviously commandeering. Commandeering. An extreme form of commandeering. Exactly. That is where I think that Reconstruction Finance and Little Lake Mazeering case come in. And by the way, understand that this is all – I know the golden rule that I'm not supposed to say is a hypothetical. This is all purely hypothetical for the reasons that I've said. There is no recalcitrant state in a position to stop a death penalty from being carried out. But if there were, if there were. There are states that have moratoria, right? Yes, yes. If the federal government went to California and said, please execute someone, do you think it's unrealistic that they would say, well, no, thank you, because our executive has made a policy judgment that we're going to reconsider capital punishment and stop it at least for the foreseeable future? I think it's not unrealistic at all that California would say that. The issue with California, as I mentioned earlier, is it's not just a moratorium. There is no protocol in place. And what the statute provides in that event is if the law of the state does not provide for implementation of the event of the death. And you're interpreting the law as not just, okay, California has a death penalty on its books. Correct. But your point is why would they be able to revoke that provision? Because the death penalty on the books does not provide for the implementation of the sentence. It does not give the protocol for how to carry out that sentence. No, California does have a protocol, or maybe it doesn't. It does not. It does not have one at all? It does not have one at all. And there are a couple of things. There's no legal requirement that a state spell out all these details by regulation or by protocol. You just do it the old-fashioned way, which is have a statute that says if you commit the following offense with the following aggravating circumstances, you get death by lethal injection, period, full stop. I think the reason that many states have the protocols that we've been discussing, though, is because courts, of course, pay attention to how those things are carried out. There are, as Judge Ketledge said, humane ways of doing it and non-humane ways of doing it. Your claim here is going way beyond any Eighth Amendment claim that's ever succeeded. I mean, even challenges to top-line methods, there's not a single one that has succeeded. To be very clear, though, this is not an Eighth Amendment challenge. I understand. This is an APA challenge. And the APA challenge is, with respect to the procedures that the federal government has dictated, they are different. Understood. We're talking about how realistic or not the problem is when states have a death penalty on the books and less fulsome protocols than, say, the federal government. There's two responses. Again, I am not familiar with a state that is actively carrying out the death penalty that does not have a fulsome procedure. The states that have moratoria, the government, of course, can go into the sentencing court and say, we are not able to implement the sentence in this state because there is a moratorium in this state or under the state law. But in California, Ms. Stepson, the law of the state of California, quote, provides for the implementation of the sentence of death. The law of California does do that, right? The statutory law. The law provides for the method of the sentence of death. Provides for what? The method of the sentence of death. But the California law doesn't have a protocol in place. And our position, and I suspect it would be the governor's position. This goes back to your earlier question. Law means not just the statute but everything else. Yes. And so the moratorium that the governor of California announced, you would say to a district judge, they would say to a district judge in California, the law of the state in California does not provide, right, for the implementation of the death penalty. Is that right? But not because of the moratorium. Why? Because of the lack of an active protocol. Well, suppose it has an active protocol but the governor just implements a moratorium. A newly elected governor says we're not going to have the death penalty. This has happened in several states. I think it happened in Illinois. It has happened. Illinois had been executing people regularly. It has happened in several states. So what happens in that situation? I think there are a couple different avenues. One of them is, as I've mentioned, which is if the government wishes it can go into the sentencing court and say the law of the state does not provide for us to carry out this execution. The sentencing court could disagree, right? The sentencing court could say, no, the law of the state provides for what it provides for, in which event the federal government in Terre Haute carries out that execution under the protocol issued by the state, regardless of the state's moratorium on state executions of prisoners. Now, I think the government would stop... Wait a minute. Oh, in your hypothetical, it's okay to use hypotheticals. Does the district court in your case, the California district court, pick Indiana? The California district court does not need to pick Indiana. It would need to pick another state that has a death penalty in which the protocol can be implemented. But, again, all of this discussion about recalcitrant states... But that has to be in that whatever state it picks. Sorry? The execution has to be in that state, whichever state it picks. In that... I'm asking how he gets over the hump of the fact is that the law of California still provides for a death penalty. Yes, but with respect to your earlier point, though, there is a phrase in that statute when it comes to the sentencing court assigning a different state. That statute actually does say, in that event, the execution shall take place in that state. That's why Mr. Sampson is being executed in New Hampshire and not Tarahoe. Maybe I asked you a question wrong, or maybe I misunderstood your question. Assume a state where the governor imposes a moratorium. It's been executing people, so it has a protocol. Okay? Yes. In that situation, can the district court invoke the latter state clause? Can the district court invoke the latter state clause? Yes. I believe it could, and I think the government presumably would argue that it could, regardless of the moratorium, because the law does not provide for implementation of the sentence under the reading of the law that the Supreme Court has endorsed. But, again, all of the... I mean, so I was concerned earlier about the line-drawing problem for what the executive branch could do, but now it seems that there might also be a line-drawing problem for when a district court would have jurisdiction to assign this to another state. And so, I mean, some of the comments that you made suggest that that might turn on how detailed the procedures are of a particular state. So even a state that has the death penalty and has, you know, maybe some protocols but not enough protocols for the government to move forward, well, then that creates the authority for the district court to assign it to another state. And that line-drawing problem seems even more concerning, perhaps. I think, Judge Rowe, it's no more a line-drawing problem than any other disputed legal issue in which a court is called upon to adjudicate. And just like the examples of manner that we were discussing, the district court has tools, including what the statute says and the party's arguments, to enable it to figure out on what side of the line that particular argument falls. So it doesn't strike me any more than the nature of determining what manner of execution is. It doesn't strike me as any more of a line-drawing problem than that. But with respect to this issue of... Well, what if the government were to go to a district court and say, I think that this, you know, state law doesn't provide for the implementation of a sentence of death in a manner that's, you know, humane and appropriate, and therefore ask the court to move it to another state? Would the government be able to do that? I think if the argument is based on in a manner that is humane and appropriate, I mean, that's the government's argument for why it is putting in place the protocol that it did, that it considers its protocol more humane than some other states. That is not what that statute calls upon the judge to do. So if that's the argument, I think the judge would decline to entertain that. If the argument is, this law doesn't provide for implementation of the sentence, full stop, that's an argument that the judge should be called upon to address and resolve. But, again, all of these questions about the states and the recalcitrant states, the reason I mention them is because they fall in line with a series of policy arguments, of course, the government has made. It would be more efficient for the government to have a single protocol. It would be a problem if a state were to resist a federal execution. All of those are policy arguments that can be made to a different body. The question here is, getting back to your initial question, Judge Rao, what does the statute say, what does it direct the states to do, and how does it direct the federal government to effectuate what the states prescribe? And our view is when the states prescribe the manner of execution, the federal government follows it. Is there no further questions? Thank you. Thank you. Ms. Paster, you can take three minutes. Thank you very much, Your Honor. I have just a few points to make. First, an understanding of manner that turns on the prisoner's experience has no historical basis, and I think it conflicts with the statute in an important way. I think even on that reading of the manner of carrying out an execution, the training and identity of the personnel who carry out the execution are unquestionably, I think they said it themselves, part of that manner. But we know that Congress did not want to hamstring the federal government in terms of personnel because of 3597. That gives the federal government flexibility. So I think there are textual reasons, even aside from the history, to reject, and the real line-drawing problems that come with that, to reject that reading. In terms of the history, plaintiffs invoked the style of gallows drop, which unquestionably affected the experience of hanging. Whether or not your neck breaks or you strangle, I think everyone would agree, is relevant to that experience, and yet nothing in the 1790 statute carries that level of detail to suggest that manner is determined by the prisoner's experience. On the 3596 point regarding alternative designations, the federal government may well find it convenient to ask the court to designate another state if it is impracticable to carry out a sentencing state's protocol. We cannot do that under the plain language of the statute. They are reading in the word manner into that alternative designation proceedings. So they are saying what it means is that the law of the state does not provide for a manner of implementation of the sentence of death. We have that sort of flexibility to go and ask for an alternative state to be designated. Our reading, and I think this is the only one that works as a matter of text, is that if the death penalty is on the book, if you are allowed to carry out, to implement the sentence of death for any crime in the state, we are stuck with that state's law. So if a state chooses through inaction, even, for a calcitrant to not help us understand the details of its protocol or to use the facilities entrenched in the state proceeding, we could well be unable to carry out a lawful federal execution. On the point of the calcitrant states, this has been referred to in a few cases. I wrote to the court to look at those cases. I took a look at them before court. And what it's referring to is when a state is trying to use its law to frustrate the government. We're not talking, I mean, I suppose you could imagine a hypothetical where a state was trying to create a statute in a way to really frustrate the government. But by and large, what we're talking about is states making their own legitimate choices about the death penalty within their own territory. They don't have to want to stymie the federal government to have that incidental effect under their reading of the statute. There are no further questions. We ask the court to vacate the interaction. Ms. Patterson and Ms. Bettson, on behalf of the court, I want to thank you for your excellent briefs and arguments today. They've been very helpful. The case is submitted.
judges: Tatel, Katsas, Rao